■ CARMINE LIMITED, Appellant, v TERENCE GORDON et al., Respondents. [837 NYS2d 146]—

Order of the Appellate Term of the Supreme Court of the State of New York, First Department, entered November 1, 2005, affirming an order of the Civil Court, New York County (Cyril K. Bedford, J.), entered on or about October 31, 2003, which, insofar as appealed from, after a nonjury trial, dismissed the nonprimary residence holdover petition as against respondent Jane Gordon, unanimously reversed, on the facts, without costs, and judgment of possession granted to petitioner as against both respondents. The Clerk is directed to enter a final judgment of possession in favor of petitioner against both respondents.

We find that petitioner landlord carried its burden of proving, by a preponderance of the evidence, that respondent Jane Gordon was not using the subject rent-stabilized apartment as her primary residence, thereby entitling landlord to recover

possession of the apartment from her pursuant to Rent Stabilization Code (9 NYCRR) § 2524.4 (c) (*see Glenbriar Co. v Lipsman*, 5 NY3d 388, 392 [2005]). Accordingly, upon review of the facts (*see* CPLR 5501 [c]), we reverse the determinations of Civil Court and Appellate Term, and grant landlord's holdover petition as against Ms. Gordon as well as against the other respondent, Terence Gordon, who did not appeal Civil Court's determination against him.

The subject apartment, No. 3A at 57 Carmine Street in Greenwich Village (hereinafter, the Village apartment), is a 450-square-foot, one-bedroom walk-up. Ms. Gordon moved into the subject apartment in 1978, when she was single. In 1982, Mr. Gordon moved into the apartment, and the couple married the following year. In 1988, a son was born to the couple.

In 1991, both Ms. Gordon and Mr. Gordon signed a lease for a rent-stabilized two-bedroom apartment in Stuyvesant Town (the Stuyvesant Town apartment), and they both signed each subsequent renewal lease for that apartment (as they did for the Village apartment) at least through 2001. Mr. Gordon had secured the opportunity to move into the Stuyvesant Town apartment with the help of a vice-president at Metropolitan Life Insurance Company, which then owned the Stuyvesant Town complex. In a 1990 letter thanking this officer for his assistance, Mr. Gordon (who was an employee of Metropolitan Life) wrote that he wanted "my family to live in Stuy Town [*sic*]" because of what he perceived as its "better quality of life." He also remarked in the letter that "living in a 480sf [*sic*] walk-up in Greenwich Village with a very energetic two year old is, well, very interesting!" The letter refers to Ms. Gordon by way of stating that, because she had relatives who were original Stuyvesant Town tenants, she had "been going there all her life." The letter gave no hint that Ms. Gordon did not intend to move into the Stuyvesant Town apartment.

The Gordons take the position that, since 1991, the Village apartment has been Ms. Gordon's primary residence and the Stuyvesant Town apartment has been the primary residence of Mr. Gordon and the couple's son (who, although 15 years old at the time of trial, was not called to testify). According to the Gordons, Mr. Gordon moved to the Stuyvesant Town apartment in 1991 as the result of marital difficulties, and since then the Gordons have had a "rocky relationship," in which periods of separation alternate with attempts to reconcile. It is undisputed, however, that the Gordons have never had a separation agreement and have never been involved in divorce proceedings. While Ms. Gordon maintains that the Village apartment has

always been her primary residence, she admits that she frequently stays at the Stuyvesant Town apartment to be with her son, as well as during periods of reconciliation with her husband. Ms. Gordon further admits that, in spite of the couple's allegedly unstable relationship, she and her husband share one joint bank account, into which her paychecks are deposited, and that Mr. Gordon pays all of the couple's bills, including rent and utilities for both apartments and invoices for a shared cell phone account in his name. In addition, Ms. Gordon testified that the bills for her American Express card are sent to the Stuyvesant Town apartment and are paid by Mr. Gordon.

The clear preponderance of probative documentary evidence and disinterested testimony supports landlord's contention that the Village apartment was not Ms. Gordon's primary residence for a substantial period of time prior to service of the nonrenewal notice in March 2000. Landlord placed in evidence the Gordons' 1998 federal and state joint income tax returns, which state that the Stuyvesant Town apartment was the home address of both individuals, and a September 2000 bank statement addressed to both Gordons at the Stuyvesant Town apartment. Landlord also presented Consolidated Edison records and the trial testimony of a Consolidated Edison representative establishing, without contradiction, that there was negligible use of electricity in the Village apartment for more than a year prior to the commencement of this proceeding, including four months (October 1999 through January 2000) in which the apartment used no electricity at all. Landlord also called the tenant of the apartment across the hall from the subject apartment (the only other tenant on the floor), who testified that for about a year and a half after he moved into his apartment in October 1999 he never saw anyone enter or leave the subject apartment, nor did he hear any sound coming from the apartment.

The documentary evidence offered by Ms. Gordon was of little or no probative value. Her voter registration card issued in 1979 is obviously too old to have any relevance to this matter. Her 2002 driver's license and a juror summons sent to her in 2003 are of slight probative value, since they were issued during the pendency of this proceeding.[1] While Ms. Gordon also placed in evidence one Consolidated Edison bill for the Village apart-

---

1. We observe that the juror summons stated that Ms. Gordon had failed to respond to juror questionnaires sent to her in August and December of 2002, suggesting that she may not have been checking her mail at the Village apartment regularly.

ment, that document merely shows that the apartment had an account with the utility, a point that has never been in dispute. The taxicab receipts that Ms. Gordon testified were for trips between the two apartments do not indicate pick-up or drop-off locations. Notably, Ms. Gordon did not offer any telephone bills for the Village apartment, and admitted that the apartment does not have a cable account.

Even when "due regard" is given to the views of the trial judge (*see 300 E. 34th St. Co. v Habeeb*, 248 AD2d 50, 55 [1997], quoting *Universal Leasing Servs. v Flushing Hae Kwan Rest.*, 169 AD2d 829, 830 [1991]), we believe that, under any fair interpretation of the record, a clear preponderance of the probative and credible evidence supports the conclusion that Ms. Gordon was not using the Village apartment as her primary residence for a substantial period of time prior to the service of landlord's notice of nonrenewal in March 2000. In making this determination, we find most persuasive the objective evidence showing that there was negligible use of electricity in the Village apartment for more than a year prior to the commencement of this proceeding (*see Briar Hill Apts. Co. v Teperman*, 165 AD2d 519, 521 [1991] [affirming landlord's recovery of possession where the "most significant item of evidence supporting the conclusion" of nonprimary residence "was the public utility records . . . showing that the electrical consumption during the relevant period was virtually nil"]). Ms. Gordon failed to provide a satisfactory explanation of the whole of this period, and gave no explanation at all for the four months during which there was no electricity use in the apartment. In addition, we draw an adverse inference from Ms. Gordon's failure to call her 15-year-old son to testify in support of her position (*see Trainor v Oasis Roller World*, 151 AD2d 323, 325 [1989]).

We further note that the credibility of both Gordons is seriously undercut by each one's mutually contradictory representations on multiple renewal leases that each of the two apartments at issue was his or her primary residence. Ms. Gordon testified that her motive for claiming the Stuyvesant Town apartment as her primary residence (a claim she now disavows) was to ensure that she would be able to move into it with her son in the event something happened to her husband. While this motive is commendable in itself, and "[s]pouses need not share a primary residence" (*Glenbriar*, 5 NY3d at 394 [Rosenblatt, J., concurring]), Ms. Gordon still had no right to claim two apartments as rent-stabilized primary residences at the same time, which is what she did until the commencement of this

proceeding.[2] Since a preponderance of the evidence clearly establishes that the Village apartment was not Ms. Gordon's primary residence at the relevant time, landlord's holdover petition must be granted. Concur—Mazzarelli, J.P., Friedman, Sullivan, Williams and Gonzalez, JJ.

---

**2.** Notably, while the Court of Appeals affirmed the dismissal of the nonprimary residence holdover petition in *Glenbriar*, the respondent spouses in that case had not simultaneously claimed two apartments as the primary residence of both husband and wife, as the Gordons have done here.