[951 NYS2d 500]

409-411 Sɪxᴛʜ Sᴛʀᴇᴇᴛ, LLC, Respondent, v Mᴀsᴀᴋᴏ Mᴏɢɪ, Appellant.

First Department, October 2, 2012

## APPEARANCES OF COUNSEL

*De Castro Law Firm*, Woodside (*Steven De Castro* of counsel), for appellant.

*Belkin Burden Wenig & Goldman, LLP*, New York City (*Robert A. Jacobs, Joseph Burden, Sherwin Belkin, Magda L. Cruz* and *Alana Wrublin* of counsel), for respondent.

## OPINION OF THE COURT

RENWICK, J.

Petitioner landlord commenced this holdover proceeding to recover possession of a rent-stabilized apartment located on East 6th Street, New York, New York, on the ground that respondent Masako Mogi (tenant) does not occupy the subject premises as her primary residence. Unlike the courts below, we find that the landlord has not established by preponderant evidence that the tenant has forfeited her principal New York residence of long standing.

The tenant occupies the subject studio apartment under a rent-stabilized lease entered into in 1980 and periodically renewed thereafter. By timely notice dated September 19, 2006, the landlord terminated the tenancy effective December 31, 2006, on the ground that the tenant had relocated to Westminster, Vermont and that she occupied the subject apartment less than 180 days a year during the preceding two-year period.

When the tenant failed to surrender possession on January 1, 2007, this holdover proceeding ensued. In her answer, the tenant denied the landlord's allegations and averred that the property she owns in Vermont was not her primary residence, but was her summer-vacation home.

Holdover Proceedings

At trial on the holdover petition, the tenant testified as a witness for petitioner as well as on her own behalf. On the landlord's case, the tenant stated that she has resided in the subject apartment since about 1980. Along with a bed, the tenant has a microwave oven, a stove, a coffee maker, medium sized refrigerator, a VCR, and small radio in the apartment. The tenant also maintained a phone line during the 2004-2006 period. In addition to herself, her friend Noriko Isogai had access to the phone, including when the tenant was not present in the New York apartment, as did her friend Earl Giaquinto, who watered the tenant's plants in the New York apartment when she was away.

Besides using her New York apartment as her living quarters, the tenant used the apartment for her business. In the period of 2004-2006, she worked as an English-to-Japanese translator on a per-assignment basis. The tenant's 2004 tax return reflected that she took a business deduction of $1,778 for utilities and $3,168 as a "rent or lease" deduction for the apartment. She listed the apartment as her business address on such return. Since about 1990, the tenant has also owned a 1½ story cabin in Westminster Vermont, consisting of a ground floor with one large room and bathroom, a second floor loft, and a storage basement. The tenant shares the cabin with her friend, Isogai, with whom she has had a close relationship for many years. The second floor loft serves as the bedroom. The ground floor has a kitchen, bathroom, dining area and living room. Unlike the tenant, Isogai uses the Vermont cabin as her exclusive residence.

During the 2004-2006 period, bills for electrical and phone service to the Vermont residence were sent to the Vermont address. Two telephone lines were maintained at the Vermont property. The Vermont electricity, gas, and telephone bills are all listed in the tenant's name. In 2004-2006, the tenant maintained a driver's licence issued by Vermont, the vehicle she co-owned with Isogai was registered in Vermont, and the vehicle was insured using an agent located in Westminster, Vermont. The vehicle, purchased in 2003, was never registered in New York.

The tenant is a citizen of Japan and a permanent resident of the United States. Each year between 2004 and 2006, she visited Japan for about one month. Her passport entries indicate that these trips took place in September 2004, April 2005, and March 2006, respectively.

The landlord also presented two witnesses who testified about the tenant's utility bills for the New York apartment during the relevant period. First, Susanne Briggs testified that she was a customer service representative for Con Edison (Con Ed). Pursuant to a subpoena, Briggs produced Con Ed records showing electrical and gas usage in the New York City apartment from January 2004 until February 2007. The amount of electricity used and gas used for the apartment was recorded. Briggs noted that the invoices were always sent to the New York City address and there was never a request to suspend service.

Second, James Carey testified that he was the president of a company specializing in reading, reporting, and installing electrical meters in commercial and residential properties. As part of his monitoring of residential meters, he was familiar with "usage of electricity by apartment dwellers." Based on his experience and his knowledge of studies conducted by the Division of Housing and Community Renewal and Housing and Uruban Development, Carey stated that the "low average" electricity usage for single-room, studio-type apartments, such as the subject one, was between 200 to 250 kilowatts per month. Commenting on the tenant's electricity usage at the New York apartment based on the 2004-2006 utility bills, which reflect between 50-150 kilowatt usage per month, Carey opined that such usage was "considerably below" the average.

Lastly, the landlord presented the testimony of Earl Giaquinto, who has been friends with Masako Mogi since 1984. When the tenant was in Vermont, Giaquinto watered the plants in her New York apartment and retrieved the mail. Giaquinto sometimes used the apartment's phone to call the tenant in Vermont about the mail she had received. Giaquinto estimated that he performed these activities at the tenant's New York apartment about three times a month in the summer. But sometimes, he added, the tenant had rush jobs or computer and dental appointments, which would cause the tenant to come to New York more often. Overall, Giaquinto estimated, the tenant spends "[m]ost of [her] time in the city."

During his testimony, Giaquinto was asked about a call he received in September 2006 in which the caller, who asserted

she had a package to deliver to the tenant, inquired about the tenant's whereabouts. The caller was actually a private investigator hired by the landlord, who specialized in "[n]on-primary residence investigations." The investigator, Joann Kunda, testified that, when she called Giaquinto on the pretext that she wanted to deliver a package to the tenant and had two addresses for her, one in New York and one in Vermont, Giaquinto answered, "she resides at both locations." According to Kunda, Giaquinto told her that the tenant "spent the majority of her time in . . . Vermont." Giaquinto, however, denied making such statement to Kunda. Instead, he testified that he told Kunda that the tenant was not at the New York address "at that time."

At trial, when the tenant was recalled as a witness on her own behalf, she testified that when she was in New York during 2004-2006, she often ate out or had "take-out." When she did prepare meals, it was done on the stove top, not the oven, or without cooking, as in the case of sushi. In Vermont, she rarely ate out. The tenant purchased the Vermont property in 1989. She was sure that her electric or gas usage at the New York apartment was not "different in any way in 2004 through 2006 compared to before [she] had the Vermont property." In support of that assertion, the tenant's Con Ed bills for 1988 and 1989 were admitted into evidence. A separate document prepared by the tenant comparing those bills to the 2004-2006 bills was also admitted into evidence.

Noriko Isogai, who resides at the Vermont cabin, testified on the tenant's behalf. Isogai, who has known the tenant for about 25 years, described the Vermont cabin as located in a rural area, 20 minutes from the nearest train station. She spends most of her time there. Isogai could not provide precise dates as to how often the tenant came to visit her cabin for the 2004-2006 period. She did remember, however, that when the tenant came to the Vermont cabin she would "kind of like come, stay a few days, go back to New York." When the tenant would travel from New York, Isogai would either pick her up from a train station in Springfield, Massachusetts, 2½ hours away from the Vermont cabin, or she would pick her up in New York. During the 2004-2006 period, Isogai did not stay in the New York apartment when the tenant was not there, except for a two-week period in 2004 when she stayed in the apartment alone when the tenant was in Japan.

In support of the tenant's position, three of her friends who reside in the New York apartment building testified on her

behalf. One of these friends, Larry Wallach, has resided at the building for about 10½ years; his apartment is one floor above the tenant's fifth floor apartment. During the 2004-2006 period, Wallach saw the tenant in and around the building "probably one to two times a week, roughly." Wallach could not recall any time during that period (either the summer, the winter, or any time of the year), that he would not see the tenant for any extended period of time. Wallach had no personal knowledge of the precise dates the tenant would spend in the New York apartment.

The tenant's friend Howard Weil has resided in a fifth floor apartment at the building since 1969. The tenant's apartment was right across the hall from Weil's apartment. Weil did not know if the tenant "owned a house" in Vermont, but he knew that "she went up to Vermont to visit." During the period of 2004-2006, Weil saw the tenant "[q]uite often" and "very frequently," as they sometimes dined or watched videos together. Weil did not recall any extended or prolonged period of time when he did not see the tenant. Although to Weil, the tenant "seems to be at the apartment most of the time," he was aware that she went to Japan "every now and then," but he did not know the duration of such visits.

The tenant's friend Leonard Levine has resided in a second-floor apartment in the building for about 20 years, and has known the tenant since that time. During the period of 2004-2006, he "usually" saw the tenant in or around the building "weekly" on "average," sometimes two to three times in one week. Levine stated that the tenant was a "continuing presence," he "would always see her and more or less she would never be away from my purview." He added, however, that "especially in the summer," he would go a week or two without seeing the tenant. While Levine often saw the tenant in and around the building, he did not meet with her on social occasions.

There were also posttrial submissions. Among other things, the landlord relied upon the tenant's credit card statements and bank ATM transactions, for the 2004-2006 period, which were admitted into evidence at trial. Although there was no testimony regarding such exhibits at trial, the landlord argued that they demonstrated that the tenant "makes frequent transactions in and around the Vermont area"; "that by 2006, the [r]espondent was spending a majority of the time in Vermont" and "in 2004 and 2005, the [r]espondent did not spend a majority of time in New York."

The tenant countered by asserting in her posttrial submission, inter alia, that:

> "[the tenant] and [Isogai] testified that they both made use of the bank account and credit card account. The bank account is jointly owned by them. The credit card is only in [the tenant's] name, but, aside from the testimony, it is clear that [Isogai] makes use of the account. For example, the credit card statements show transactions in the United States during all three periods when [the tenant] was undisputedly in Japan."

Posttrial Proceedings

After trial, Civil Court granted the landlord's petition, finding that the evidence established that the tenant did not have a substantial nexus to the New York apartment. Civil Court, however, did not find "particularly persuasive" the fact that the tenant's "electrical usage in her New York City apartment was well below average, and that it was significantly lower than her usage in Vermont." In the court's view, these facts were not probative of whether the tenant did not use her New York apartment because it was undisputed that the tenant does not occupy the New York apartment "full time" while her companion occupied the Vermont house "full time"; and that the Vermont electric bills cover heat and hot water, while those utilities are provided by the landlord in New York.

Instead, in determining that the New York apartment was not the tenant's primary residence, the court found that

> "[t]he most persuasive evidence offered at trial was Ms. Mogi's banking and credit card records. These records include Ms. Mogi's credit, debit, and ATM transactions over the relevant period, and appear to give an accurate account of her location for most days between 2004 and October 19, 2006. . . .

> "Ms. Mogi spent 120 days during the relevant time period visiting her family in Japan. These days tell us nothing about her primary residence. Of the remaining 846 'known' days in the time period, Ms. Mogi appears to have spent 378, or 45%, in New York and 468, or 55% in Vermont.

> "Based primarily upon the banking and credit card records, I find that respondent did not spend 183

days per year in her New York apartment. Accordingly, final judgment is directed for petitioner."

While the court primarily based its determination on the banking and credit card records, the court made reference to other factors that indicated that the tenant's primary residence was in Vermont, including, inter alia, that the jointly held vehicle was registered in Vermont, and that both women held only Vermont driver's licenses. The court further found that the tenant's witnesses who testified that they regularly saw her in New York did not have "any detailed knowledge of when she was in New York and when she was in Vermont." The court also noted that the tenant "herself also testified that she could not identify dates when she was in New York and dates when she was in Vermont."

On appeal, the Appellate Term found that Civil Court "may have placed undue emphasis on documents reflecting the credit card and bank transactions made by tenant and her companion" (27 Misc 3d 126[A], 2010 NY Slip Op 50511[U], *1 [2010]). Nevertheless, the Appellate Term found that "any such error [did] not warrant reversal on this record" (id.). Instead, Appellate Term held that a fair interpretation of the evidence supported the Civil Court's finding that the New York apartment is not the tenant's primary residence. In this regard, contrary to Civil Court, which found nothing unusual about the tenant's low electricity use in the New York apartment, Appellate Term noted that the "[l]andlord established that there was negligible electricity usage in the apartment for more than two years prior to the commencement of this proceeding" (id.). The Appellate Term, however, affirmed based on additional factors which were similarly relied upon by Civil Court, including the tenant's Vermont driver's license and the jointly owned vehicle's Vermont registration. Appellate Term also took into account that the tenant "acknowledged that she spends a substantial amount of time in a house she owns in Westminster, Vermont . . . where [her] long-time companion admittedly primarily resides" (id.). We granted the tenant's motion for leave to appeal to the Appellate Division, and we now reverse.

Analysis

In view of the considerable protections accorded tenants of regulated units, the beneficiaries of these safeguards are required, as a quid pro quo, to actually and principally utilize their apartments for dwelling purposes (see 542 E. 14th St. LLC v Lee, 66 AD3d 18, 21-22 [1st Dept 2009]; Hughes v Lenox Hill

*Hosp.*, 226 AD2d 4 [1st Dept 1996], *lv dismissed and denied* 90 NY2d 829 [1997]). Thus, the governing statute provides that a landlord may recover possession of a rent-stabilized apartment if it "is not occupied by the tenant . . . as his or her primary residence" (Rent Stabilization Code [9 NYCRR] § 2524.4 [c]). "[P]rimary residence" is judicially construed as " 'an ongoing, substantial, physical nexus with the . . . premises for actual living purposes' " (*Katz Park Ave. Corp. v Jagger*, 11 NY3d 314, 317 [2008], quoting *Emay Props. Corp. v Norton*, 136 Misc 2d 127, 129 [App Term, 1st Dept 1987]).

Although the statutes do not define "primary residence," the Rent Stabilization Code does provide that "no single factor shall be solely determinative," and lists "evidence which may be considered" in making the determination (9 NYCRR 2520.6 [u]; *see e.g. Katz*, 11 NY3d at 317; *Glenbriar Co. v Lipsman*, 5 NY3d 388, 392-393 [2005]; *Chelsmore Apts. v Garcia*, 189 Misc 2d 542, 543-544 [Civ Ct, NY County 2001], *affd* 2003 NY Slip Op 50621[U] [2003]). These factors include (1) the tenant's use or nonuse of an address other than the address of the subject apartment on a tax return, motor vehicle registration, driver's license, or other publicly filed document; (2) the tenant's use or nonuse of an address other than the address of the subject apartment as a voting address; (3) whether the tenant lived in the subject apartment for fewer than 183 days in a calendar year; and (4) whether the tenant subleased the apartment (9 NYCRR 2520.6 [u] [1], [2], [3], [4]).

Courts have also considered factors not included in 9 NYCRR 2520.6 (u). For example, a court may examine the tenant's entire tenancy history in the stabilized apartment to ascertain primary residence (*see 615 Co. v Mikeska*, 75 NY2d 987, 988 [1990]). A tenant's telephone and other utility bills that show how often the tenant used utilities in the apartment is probative of whether the tenant had the requisite physical nexus to the apartment (*see Carmine Ltd. v Gordon*, 41 AD3d 196 [1st Dept 2007]; *Briar Hill Apts. Co. v Teperman*, 165 AD2d 519 [1st Dept 1991]). Testimony from neighbors and building employees about the tenant's absence from or presence in the rent-stabilized apartment is yet another factor (*see e.g. Harran Holding Corp. v Fowler*, NYLJ, Apr. 28, 1987, at 5, col 4).

To prevail in a nonprimary residence proceeding, a landlord must establish by a preponderance of the evidence that during the relevant time period, the tenant did not occupy the subject apartment as his or her primary residence (*Glenbriar Co.*, 5

NY3d at 392). The tenant may rebut the landlord's proof to establish "a substantial physical nexus to the apartment" (*id.* at 393, citing *Draper v Georgia Props.*, 94 NY2d 809, 811 [1999]). In terms of the burden of proof, "proof sufficient to make a prima facie showing of nonprimary residence shifts the burden of going forward to the tenant, [but] the ultimate burden of persuasion remains on the landlord seeking eviction on the basis of nonprimary residence" (*ACP 150 W. End Ave. Assoc., L.P. v Greene*, 15 Misc 3d 1112[A], 2007 NY Slip Op 50589[U], *2 [2007]; *see Emel Realty Corp. v Carey*, 288 AD2d 163 [1st Dept 2001]).

Here, even when "due regard" is given to the views of the trial judge (*300 E. 34th St. Co. v Habeeb*, 248 AD2d 50, 55 [1st Dept 1997], quoting *Universal Leasing Servs. v Flushing Hae Kwan Rest.*, 169 AD2d 829, 830 [2d Dept 1991]), we believe that, under any fair interpretation of the record, a clear preponderance of the probative and credible evidence supports the conclusion that the tenant was using the New York apartment as her primary residence for a substantial period of time prior to the service of landlord's notice of nonrenewal in September 2006.

Indeed, it is uncontested that the tenant has lived in the New York apartment for over 30 years (*see 615 Co. v Mikeska*, 75 NY2d at 988). Moreover, the tenant's testimony demonstrated that the New York apartment is fully furnished and she maintained a full-time job in Manhattan during the relevant period. With respect to the tenant's Vermont house, the tenant's testimony demonstrated that the house serves not as her primary residence, but as a second residence that she uses on weekends, holidays and vacations. While the tenant undoubtedly has a long-term and deep connection to the Vermont house, it is nothing more than her weekend/vacation home, as corroborated by the testimony of Isogai, and New York cotenants who saw her constantly in the New York apartment during the relevant time period.

Significantly, neither Civil Court, which heard the trial testimony, nor the Appellate Term, made any finding that these witnesses were incredible. As indicated, both Civil Court and Appellate Term were troubled by the fact that none of the tenants had "any detailed knowledge of when [the tenant] was in New York and when she was in Vermont." There is not, however, an absolute requirement that a tenant quantify the numbers of days he or she spent in the apartment each relevant year. What

is significant here is that all the tenant's friends and cotenants consistently testified of the tenant's constant presence in the New York apartment during the relevant period, which is sufficient for the purpose of establishing an ongoing, substantial and physical nexus with the regulated premises (*see 310 E. 23rd LLC v Colvin*, 41 AD3d 149 [1st Dept 2007]; *300 E. 34th St. Co. v Habeeb*, 248 AD2d at 55). In our review of the record, we find no basis to reject the New York tenants' testimonies as incredible. In fact, the landlord failed to produce any witness who lived or worked in the New York apartment building during the relevant time period to rebut their testimony.

Likewise, there is simply no reason to find that the tenant's testimony was not credible. Unlike the Appellate Term, we are not troubled by the fact that the tenant "acknowledged that she spends a substantial amount of time in a house she owns in . . . Vermont . . . where [her] long-time companion admittedly primarily resides" (2010 NY Slip Op 50511[U], *1). For there is nothing inconsistent with the tenant having a primary residence in New York and concomitantly spending "a substantial" amount of time in Vermont with her long-time friend and companion. An apartment should not be decontrolled merely because its tenant decides to spend her weekends, holidays and vacation days in a second home that she shares with a long-term friend and companion.

Indeed, legitimate arrangements of this kind have been consistently recognized by this Court (*see e.g. 310 E. 23rd LLC v Colvin*, 41 AD3d at 149-150 ["subject apartment was at all relevant times respondent's primary residence and that the house she owns in upstate New York is a second residence that she uses on weekends, holidays and vacations"]). For instance, in *Glenbriar Co. v Lipsman* (11 AD3d 352 [1st Dept 2004], *affd* 5 NY3d 388 [2005]), this Court found that a wife could consider New York City her primary residence even though both spouses resided together as "snowbirds," part time in Florida, and part time in New York City, and the husband had "embraced Florida as his residence for its tax advantages and to preserve his assets in retirement" (*Glenbriar Co. v Lipsman*, 2002 NY Slip Op 50225[U], *5 [App Term, 1st Dept 2002, Gangel Jacob, J., concurring]). These types of arrangements are consistent with the restrictions of rent stabilization, which is designed to preclude the warehousing of apartments by those who establish primary residence elsewhere (*Katz*, 11 NY3d at 317-318); it was not intended to allow the eviction of an individual, like the ten-

ant here, who travels extensively for personal reasons but who otherwise maintains a substantial physical nexus with her New York City apartment.

We find that the credibility of the witnesses, who established that the tenant has maintained a substantial physical nexus with her New York apartment, is not seriously undercut by the documentary evidence. As indicated by Appellate Term, Civil Court's reliance upon credit and debit card transactions to determine when the tenant was at her second home in Vermont was speculative, as both respondent and her companion (a Vermont resident) are authorized to use the cards. Further, even under the Civil Court's speculative formula, and allowing some margin of error for same, it is significant that the tenant was in New York 45% of the time, which is not insignificant. As for the other factors relied upon by Appellate Term, the tenant appears to have adequately explained her low electrical consumption in New York (see Briar Hill Apts. Co., 165 AD2d at 522-523), and it is not remarkable that her driver's license and vehicle registration were issued in Vermont, as the vehicle is co-owned with the tenant's close friend.

In sum, this Court finds that the preponderance of the evidence establishes that the tenant occupied the subject New York apartment as her primary residence during the 2004-2006 period. Inconclusive is the evidence the landlord introduced to buttress its theory that the tenant maintained her Vermont cabin rather than the subject apartment as her primary residence. The landlord's evidence is explainable and is as likely, if not more likely, to support a finding that the tenant occupied the subject apartment as her primary residence. Given the documentary and testimonial evidence connecting the tenant to the subject apartment, the landlord has not met its burden to persuade this Court that the tenant did not occupy the subject apartment as her primary residence during the 2004-2006 period.

Accordingly, the order of the Appellate Term of the Supreme Court, First Department, entered on or about March 29, 2010, which, in a nonprimary residence holdover proceeding, affirmed a judgment of Civil Court, New York County (Jean T. Schneider, J.), entered on or about August 8, 2008, after a nonjury trial, awarding petitioner-landlord possession of the subject premises, should be reversed, on the law and the facts, without costs, the holdover petition denied, and the proceeding dismissed. The Clerk is directed to enter judgment accordingly.

CATTERSON, J. (dissenting). I must respectfully dissent. As a threshold issue, the majority has applied an incorrect standard of review in holding in its opening paragraph that "the landlord has not established by preponderant evidence" that the tenant did not use the subject apartment as her primary residence. The generally accepted standard for appellate review in a nonprimary residence action is whether "it is obvious that the [fact-finding] court's conclusions could not be reached under any fair interpretation of the evidence." (*Claridge Gardens v Menotti*, 160 AD2d 544, 545 [1st Dept 1990]; *see also 542 E. 14th St. LLC v Lee*, 66 AD3d 18, 22 [1st Dept 2009]; *AGCO Corp. v Northrop Grumman Space & Mission Sys. Corp.*, 61 AD3d 562, 563-564 [1st Dept 2009].) Here, the majority's analysis does not depend on showing why it is *obvious* that "any fair interpretation of the evidence" cannot lead to the determination reached by Civil Court and affirmed by Appellate Term. Instead, it simply substitutes its own *different* interpretation of evidence such as the tenant's credit card transactions in Vermont and "negligible" electric usage at the subject apartment.

In any event, and for the reasons set forth in greater detail below, I also disagree if the majority, by holding that the landlord did not establish the tenant's nonprimary use of the apartment by "preponderant evidence," means that the landlord did not satisfy its initial burden. In addition to the documentary evidence of the tenant's credit card transactions and "negligible" electric usage, two of the four statutory factors that may be weighed as evidence of nonprimary use point in favor of the landlord's position. Moreover, the tenant failed to rebut this documentary evidence with objective, empirical proof that she maintained a "substantial nexus" to the subject premises during the relevant period. Specifically, the testimony of her witnesses, who were other residents of the building, does not comport with the type of testimony that has been accepted by this Court to establish primary residence use of a rent-stabilized apartment. For example, the testimony of a tenant on which the majority relies and which includes the statement that the respondent tenant "would never be away from my purview" cannot be accepted as credible, but only as meaningless and useless hyperbole.

The record reflects that the tenant occupied a rent-stabilized apartment, owned by landlord, located on East 6th Street in Manhattan since 1980. Since 1989, she has also owned a residence in Vermont where her long-time companion resides permanently. In September 2006, the landlord served a notice of

non-renewal on the tenant on the ground she had not used the apartment as her primary residence in 2004-2006. By holdover petition, the landlord sought a final judgment of possession on nonprimary residence grounds. The tenant denied the allegation, and a nonjury trial was held in December 2007.

The Civil Court found in favor of the landlord, basing its decision primarily on the tenant's bank and credit card transactions. The court determined the tenant's location by counting the days between two Vermont transactions as time spent in Vermont, and days between two New York transactions as time spent by the tenant in New York. Accordingly, the court found that the tenant spent 45% of the relevant period in New York, and the remaining 55% in Vermont. Thus, the court concluded that the tenant resided in New York less than 183 days per calendar year. It also noted that the tenant owned a vehicle that was registered in Vermont, and the tenant held a Vermont driver's license. The court refused to credit testimony from witnesses regarding the tenant's "continual" presence in New York on the ground that neither the witnesses nor the tenant were able to identify specific dates or point to specific blocks of time when the tenant was in New York. Appellate Term affirmed, holding that a "fair interpretation of the evidence" supported the Civil Court's determination. (27 Misc 3d 126[A], 2010 NY Slip Op 50511[U], *1 [2010].) The Appellate Term focused on the "negligible" electric usage in the New York apartment and the Vermont address used by the tenant for her driver's license and vehicle registration. The Appellate Term also found it significant that the tenant's long-time companion resided at the Vermont house, and that the tenant acknowledged she spent a "substantial" amount of time at the Vermont residence.

For the reasons set forth below, I would affirm. As previously noted, it is well settled that in nonprimary residence actions, "the decision of the fact-finding court should not be disturbed upon appeal unless it is obvious that the court's conclusions [cannot] be reached under *any fair interpretation of the evidence.*" (*Claridge Gardens,* 160 AD2d at 544-545 [emphasis added]; *see also AGCO Corp.,* 61 AD3d at 563-564.) This is especially true when the "findings of fact rest in large measure on considerations relating to the credibility of witnesses." (*Claridge Gardens,* 160 AD2d at 545.)

The landlord bears the initial burden of establishing by a preponderance of the evidence that the tenant is not occupying

the subject apartment as his or her primary residence. (*See Glenbriar Co. v Lipsman*, 5 NY3d 388 [2005].) If the landlord satisfies its initial burden, the tenant may rebut the evidence by demonstrating "a substantial physical nexus to the apartment." (5 NY3d at 393, citing *Draper v Georgia Props.*, 94 NY2d 809, 811 [1999].) The tenant must satisfy this burden with "objective, empirical evidence." (*Emay Props. Corp. v Norton*, 136 Misc 2d 127, 128-129 [App Term, 1st Dept 1987].) However, the ultimate burden of persuasion remains with the landlord. (*Emel Realty Corp. v Carey*, 188 Misc 2d 280, 282-283 [App Term, 1st Dept 2001 per curiam], *affd* 288 AD2d 163 [1st Dept 2001].)

The term "primary residence" has not been defined by statute. (*Katz Park Ave. Corp. v Jagger*, 11 NY3d 314, 317 [2008].) However, the Rent Stabilization Code provides a list of factors that may be considered as evidence in determining whether a rent-stabilized apartment is a tenant's primary residence. (*See* Rent Stabilization Code [9 NYCRR] § 2520.6 [u].) The factors include (1) the tenant's use or nonuse of the apartment address on a tax return, motor-vehicle registration, driver's license, or other publicly filed document; (2) the tenant's use or nonuse of the apartment's address as a voting address; (3) whether the tenant has lived in the apartment for fewer than 183 days in a calendar year; and (4) whether the tenant has subleased the apartment. (*See id.*)

In this case, in my opinion, the hearing court and the Appellate Term properly found that two of the four statutory factors undisputably favor a finding that the apartment was not the tenant's primary residence. (*See id.*) While the tenant, as a Japanese citizen, is not eligible to vote, and thus has no address for voter registration purposes, she listed her Vermont address on her driver's license and vehicle registration. Moreover, she listed the New York apartment address on a federal tax return only once in the relevant period and solely for the purpose of deducting her utilities and rent as a *business* expense. Additionally, in my opinion the Civil Court's determination that the tenant spent less than 183 days per calendar year for the relevant period in the New York apartment was a fair interpretation of the evidence of the tenant's credit card transactions. There was no evidence or any dispute to counter the assumption that the card traveled with tenant between New York and Vermont even though the tenant testified that her companion was authorized to use the credit and debit card. The tenant did not deny that she was in Vermont on any day when a Vermont transaction oc-

curred, or provide evidence that she traveled to New York on any day in between two Vermont transactions: she did not maintain a parking space in New York, did not purchase an E-Z Pass, or provide Amtrak travel receipts or tickets to show travel between Vermont and New York.

In addition to the evidence suggested by the four statutory factors, a landlord is permitted to present other evidence, such as electrical bills. (*See ACP 150 W. End Ave. Assoc., L.P. v Greene,* 15 Misc 3d 1112[A], 2007 NY Slip Op 50589[U] [Civ Ct, NY County 2007]; *see also Janco Realty Corp. v Lee,* NYLJ, July 16, 1987, at 11, col 1 [App Term, 1st Dept 1987 per curiam] [telephone and other utility bills indicating frequency of use].) Evidence of negligible electrical usage is a significant factor used by courts in nonprimary residence analyses. (*See Briar Hill Apts. Co. v Teperman,* 165 AD2d 519 [1st Dept 1991] [finding minimal electrical use]; *see also 156 E. 37th St. LLC v Black,* 25 Misc 3d 1239[A], 2009 NY Slip Op 52496[U] [Civ Ct, NY County 2009] [noting low electrical consumption inconsistent with everyday living purposes].) In *Carmine Ltd. v Gordon* (41 AD3d 196 [1st Dept 2007]), this Court held for the landlord primarily on the basis of the tenant's low electrical consumption. (41 AD3d at 198.) In *Carmine Ltd.,* the tenant's electrical records demonstrated that for four months, there was no electrical usage, and for seven months, the electrical usage did not exceed that which a refrigerator by itself would consume according to testimony from a Consolidated Edison employee. (*See Carmine Ltd. v Gordon,* 9 Misc 3d 138[A], 2005 NY Slip Op 51763[U] [App Term, 1st Dept 2005, McCooe, J., dissenting], *revd* 41 AD3d at 196.) In this case, the landlord presented similarly compelling evidence of the tenant's "negligible" electrical usage during the relevant period.

Two witnesses testified about the tenant's electrical consumption. The first, a customer service representative for Consolidated Edison, produced 35 of the tenant's monthly bills (indicating actual usage in kilowatt hours and cost of consumption) from January 2004 until February 2007. The records reveal that for 33 of the 35 months, or 94% of the time, the tenant used between 55 and 133 kilowatt hours per month.

Further, the second witness, the landlord's expert on reading, reporting, and installing electrical meters for residential and commercial properties, testified that the tenant's electrical usage, at 50-150 kilowatt hours per month, was "considerably below" the average of 200 to 250 kilowatt hours for similarly-

sized studio apartments in Manhattan where the landlord provides heat and hot water as it does in the tenant's case. The expert testified that a standard refrigerator alone consumes 140 kilowatt hours per month. In my opinion, the tenant's explanation, which the majority accepts as adequate, cannot help her. That the tenant eats out or orders "take-out" in New York and does not cook in her oven does not explain why her electrical consumption during the relevant dates was either below, or roughly equal to, only that which a standard refrigerator alone uses. Indeed, in my opinion, a fair interpretation of such negligible consumption is that the tenant did not use her microwave, VCR, coffee maker, hair dryer, television or radio at any time during the relevant months. In other words she did not use the apartment for actual living purposes. Finally, the tenant's attempt to explain her low New York electrical consumption by offering records from 1988-1989 which show similar consumption is, I believe, a wasted effort. There is simply no evidence that she was primarily residing in the apartment during that period either even though that period, when she purchased the Vermont property, is not at issue in this case.

Further, contrary to the majority's conclusion, I believe that the testimony of the tenant's witnesses fails to provide the requisite objective, empirical evidence to show that the tenant maintained a substantial nexus to the subject apartment for the relevant period. The majority emphasizes that no one found that "these witnesses were incredible." In my opinion, that misses the point: even if credible (and some of it as mentioned above was plainly not credible), the testimony was too vague to effectively rebut the evidence presented by the landlord. Of the three neighbors who testified on behalf of the tenant, the first lived on the sixth floor, one floor above the tenant. He stated he saw the tenant in New York during the relevant period "probably one to two times a week, *roughly*" (emphasis added). The second neighbor testified he lived across the hall from the tenant. He stated he saw the tenant "very frequently," that he shared meals with her, and watched films with her "occasionally." The third neighbor lived on the second floor. He testified he saw the tenant *roughly* twice a week, and that the tenant was "never . . . away from my purview." None of the three neighbors stated how often, or when, the tenant was in New York. Moreover, although the tenant admittedly visited Japan for approximately one month each year in 2004-2006, none of the witnesses could recall those specific absences. More

significantly, neither the tenant nor her long-time companion could specify any dates or periods of time when the tenant was in New York, and equally significantly could not produce any documentary evidence of travel between New York and Vermont whether by car or train or plane.

Generalized, sweeping statements from witnesses that they saw the tenant "quite often," or "roughly twice a week" are as meaningless as the hyperbolic claim that the tenant was "never . . . away from my purview." Indeed, precedent suggests such vague statements are insufficient to rebut any of the landlord's documentary evidence. (*See e.g.*, *156 E. 37th St. LLC v Black*, 25 Misc 3d 1239[A], 2009 NY Slip Op 52496[U] [Civ Ct, NY County 2009], *supra.*)

The majority's reliance on *300 E. 34th St. Co. v Habeeb* (248 AD2d 50 [1st Dept 1997]) is misplaced. In *Habeeb*, the tenant demonstrated a substantial nexus to the subject apartment through witnesses who either lived with the tenant or visited the subject apartment daily and who testified to seeing the tenant in the subject apartment on a *daily* and *nightly* basis. (248 AD2d at 52.) The majority's reliance on *310 E. 23rd LLC v Colvin* (41 AD3d 149 [1st Dept 2007]) is equally misplaced. In *Colvin*, there is no reference to any testimony other than the tenant's, thus the decision cannot stand for the proposition that vague testimony of friends and neighbors can establish a tenant's substantial nexus for primary residential purposes.

Moreover, contrary to the testimony of the tenant and her witnesses, the landlord's investigator testified that when she called the apartment, an acquaintance of the tenant who was identified as a friend who visited the apartment to water plants and pick up phone messages answered and said that the "[tenant] resides at both locations" and that she "spent the majority of her time . . . in Vermont." The majority is incorrect in stating that the tenant maintained a full-time job in Manhattan during the relevant period. The tenant, in fact, testified she was not employed, and worked only on an "[a]s-needed basis." Indeed, it appears that the tenant used the subject apartment as her business office. On her 2004 federal tax return, she took a business deduction for rent and utilities, and labeled the apartment as her business address. In addition, one witness testified the tenant would *occasionally* return to New York for "rush jobs." Thus, a fair interpretation of the evidence is that the tenant used the apartment during the relevant period as a business space and not for actual dwelling purposes as required by the

Rent Stabilization Code. (*See Sommer v Ann Turkel, Inc.*, 137 Misc 2d 7, 10 [App Term, 1st Dept 1987] [stating the purpose of the Rent Stabilization Code is to protect "those tenants who actually require and actively use their apartments for *dwelling* purposes"] [emphasis added]).

Finally, the landlord produced evidence to show that in 2001, the tenant was primarily residing in Vermont. The tenant sent a letter dated October 15, 2001, to the former landlord of the building, stating "[i]n view of the September 11 WTC [a]ttacks and the ensuing situations, I am temporarily staying away from NYC" and requested that her "rent bill and other correspondence" be mailed to the Vermont address. The record contains no evidence of any notification that the tenant returned to use the New York apartment as a primary residence.

Given all of the foregoing, in my opinion, a fair interpretation of the evidence in this case leads to the conclusion that although the tenant moved into the subject apartment approximately 30 years ago, she relocated to Vermont after the events of 9-11 in 2001, and thereafter no longer used the New York apartment as her primary residence. The majority, in my opinion, neither attempts to nor does it establish that it is obvious that such conclusion *cannot* be reached under any fair interpretation of the evidence.

MAZZARELLI, J.P., and FREEDMAN, J., concur with RENWICK, J.; FRIEDMAN and CATTERSON, JJ., dissent in a separate opinion by CATTERSON, J.

Order of the Appellate Term of the Supreme Court, First Department, entered on or about March 29, 2010, reversed, on the law and the facts, without costs, the holdover petition denied and the proceeding dismissed. The Clerk is directed to enter judgment accordingly.