OPINION OF THE COURT
Renwick, J.
‘ Petitioner landlord commenced this holdover proceeding to recover possession of a rent-stabilized apartment located on East 6th Street, New York, New York, on the ground that respondent Masako Mogi (tenant) does not occupy the subject premises as her primary residence. Unlike the courts below, we find that the landlord has not established by preponderant evidence that the tenant has forfeited her principal New York residence of long standing.
The tenant occupies the subject studio apartment under a rent-stabilized lease entered into in 1980 and periodically renewed thereafter. By timely notice dated September 19, 2006, the landlord terminated the tenancy effective December 31, 2006, on the ground that the tenant had relocated to Westminster, Vermont and that she occupied the subject apartment less than 180 days a year during the preceding two-year period. *114 When the tenant failed to surrender possession on January 1, 2007, this holdover proceeding ensued. In her answer, the tenant denied the landlord’s allegations and averred that the property she owns in Vermont was not her primary residence, but was her summer-vacation home.
Holdover Proceedings
At trial on the holdover petition, the tenant testified as a witness for petitioner as well as on her own behalf. On the landlord’s case, the tenant stated that she has resided in the subject apartment since about 1980. Along with a bed, the tenant has a microwave oven, a stove, a coffee maker, medium sized refrigerator, a VCR, and small radio in the apartment. The tenant also maintained a phone line during the 2004-2006 period. In addition to herself, her friend Noriko Isogai had access to the phone, including when the tenant was not present in the New York apartment, as did her friend Earl Giaquinto, who watered the tenant’s plants in the New York apartment when she was away.
Besides using her New York apartment as her living quarters, the tenant used the apartment for her business. In the period of 2004-2006, she worked as an English-to-Japanese translator on a per-assignment basis. The tenant’s 2004 tax return reflected that she took a business deduction of $1,778 for utilities and $3,168 as a “rent or lease” deduction for the apartment. She listed the apartment as her business address on such return. Since about 1990, the tenant has also owned a IV2 story cabin in Westminster Vermont, consisting of a ground floor with one large room and bathroom, a second floor loft, and a storage basement. The tenant shares the cabin with her friend, Isogai, with whom she has had a close relationship for many years. The second floor loft serves as the bedroom. The ground floor has a kitchen, bathroom, dining area and living room. Unlike the tenant, Isogai uses the Vermont cabin as her exclusive residence.
During the 2004-2006 period, bills for electrical and phone service to the Vermont residence were sent to the Vermont address. Two telephone lines were maintained at the Vermont property. The Vermont electricity, gas, and telephone bills are all listed in the tenant’s name. In 2004-2006, the tenant maintained a driver’s licence issued by Vermont, the vehicle she co-owned with Isogai was registered in Vermont, and the vehicle was insured using an agent located in Westminster, Vermont. The vehicle, purchased in 2003, was never registered in New York.
*115 The tenant is a citizen of Japan and a permanent resident of the United States. Each year between 2004 and 2006, she visited Japan for about one month. Her passport entries indicate that these trips took place in September 2004, April 2005, and March 2006, respectively.
The landlord also presented two witnesses who testified about the tenant’s utility bills for the New York apartment during the relevant period. First, Susanne Briggs testified that she was a customer service representative for Con Edison (Con Ed). Pursuant to a subpoena, Briggs produced Con Ed records showing electrical and gas usage in the New York City apartment from January 2004 until February 2007. The amount of electricity used and gas used for the apartment was recorded. Briggs noted that the invoices were always sent to the New York City address and there was never a request to suspend service.
Second, James Carey testified that he was the president of a company specializing in reading, reporting, and installing electrical meters in commercial and residential properties. As part of his monitoring of residential meters, he was familiar with “usage of electricity by apartment dwellers.” Based on his experience and his knowledge of studies conducted by the Division of Housing and Community Renewal and Housing and Uruban Development, Carey stated that the “low average” electricity usage for single-room, studio-type apartments, such as the subject one, was between 200 to 250 kilowatts per month. Commenting on the tenant’s electricity usage at the New York apartment based on the 2004-2006 utility bills, which reflect between 50-150 kilowatt usage per month, Carey opined that such usage was “considerably below” the average.
Lastly, the landlord presented the testimony of Earl Giaquinto, who has been friends with Masako Mogi since 1984. When the tenant was in Vermont, Giaquinto watered the plants in her New York apartment and retrieved the mail. Giaquinto sometimes used the apartment’s phone to call the tenant in Vermont about the mail she had received. Giaquinto estimated that he performed these activities at the tenant’s New York apartment about three times a month in the summer. But sometimes, he added, the tenant had rush jobs or computer and dental appointments, which would cause the tenant to come to New York more often. Overall, Giaquinto estimated, the tenant spends “[m]ost of [her] time in the city.”
During his testimony, Giaquinto was asked about a call he received in September 2006 in which the caller, who asserted *116 she had a package to deliver to the tenant, inquired about the tenant’s whereabouts. The caller was actually a private investigator hired by the landlord, who specialized in “[n] on-primary residence investigations.” The investigator, Joann Kunda, testified that, when she called Giaquinto on the pretext that she wanted to deliver a package to the tenant and had two addresses for her, one in New York and one in Vermont, Giaquinto answered, “she resides at both locations.” According to Kunda, Giaquinto told her that the tenant “spent the majority of her time in . . . Vermont.” Giaquinto, however, denied making such statement to Kunda. Instead, he testified that he told Kunda that the tenant was not at the New York address “at that time.”
At trial, when the tenant was recalled as a witness on her own behalf, she testified that when she was in New York during 2004-2006, she often ate out or had “take-out.” When she did prepare meals, it was done on the stove top, not the oven, or without cooking, as in the case of sushi. In Vermont, she rarely ate out. The tenant purchased the Vermont property in 1989. She was sure that her electric or gas usage at the New York apartment was not “different in any way in 2004 through 2006 compared to before [she] had the Vermont property.” In support of that assertion, the tenant’s Con Ed bills for 1988 and 1989 were admitted into evidence. A separate document prepared by the tenant comparing those bills to the 2004-2006 bills was also admitted into evidence.
Noriko Isogai, who resides at the Vermont cabin, testified on the tenant’s behalf. Isogai, who has known the tenant for about 25 years, described the Vermont cabin as located in a rural area, 20 minutes from the nearest train station. She spends most of her time there. Isogai could not provide precise dates as to how often the tenant came to visit her cabin for the 2004-2006 period. She did remember, however, that when the tenant came to the Vermont cabin she would “kind of like come, stay a few days, go back to New York.” When the tenant would travel from New York, Isogai would either pick her up from a train station in Springfield, Massachusetts, 21/2 hours away from the Vermont cabin, or she would pick her up in New York. During the 2004-2006 period, Isogai did not stay in the New York apartment when the tenant was not there, except for a two-week period in 2004 when she stayed in the apartment alone when the tenant was in Japan.
In support of the tenant’s position, three of her friends who reside in the New York apartment building testified on her *117 behalf. One of these friends, Larry Wallach, has resided at the building for about IOV2 years; his apartment is one floor above the tenant’s fifth floor apartment. During the 2004-2006 period, Wallach saw the tenant in and around the building “probably one to two times a week, roughly.” Wallach could not recall any time during that period (either the summer, the winter, or any time of the year), that he would not see the tenant for any extended period of time. Wallach had no personal knowledge of the precise dates the tenant would spend in the New York apartment.
The tenant’s friend Howard Weil has resided in a fifth floor apartment at the building since 1969. The tenant’s apartment was right across the hall from Weil’s apartment. Weil did not know if the tenant “owned a house” in Vermont, but he knew that “she went up to Vermont to visit.” During the period of 2004-2006, Weil saw the tenant “[q]uite often” and “very frequently,” as they sometimes dined or watched videos together. Weil did not recall any extended or prolonged period of time when he did not see the tenant. Although to Weil, the tenant “seems to be at the apartment most of the time,” he was aware that she went to Japan “every now and then,” but he did not know the duration of such visits.
The tenant’s friend Leonard Levine has resided in a second-floor apartment in the building for about 20 years, and has known the tenant since that time. During the period of 2004-2006, he “usually” saw the tenant in or around the building “weekly” on “average,” sometimes two to three times in one week. Levine stated that the tenant was a “continuing presence,” he “would always see her and more or less she would never be away from my purview.” He added, however, that “especially in the summer,” he would go a week or two without seeing the tenant. While Levine often saw the tenant in and around the building, he did not meet with her on social occasions.
There were also posttrial submissions. Among other things, the landlord relied upon the tenant’s credit card statements and bank ATM transactions, for the 2004-2006 period, which were admitted into evidence at trial. Although there was no testimony regarding such exhibits at trial, the landlord argued that they demonstrated that the tenant “makes frequent transactions in and around the Vermont area”; “that by 2006, the [Respondent was spending a majority of the time in Vermont” and “in 2004 and 2005, the [Respondent did not spend a majority of time in New York.”
*118 The tenant countered by asserting in her posttrial submission, inter alia, that:
“[the tenant] and [Isogai] testified that they both made use of the bank account and credit card account. The bank account is jointly owned by them. The credit card is only in [the tenant’s] name, but, aside from the testimony, it is clear that [Isogai] makes use of the account. For example, the credit card statements show transactions in the United States during all three periods when [the tenant] was undisputedly in Japan.”
Posttrial Proceedings
After trial, Civil Court granted the landlord’s petition, finding that the evidence established that the tenant did not have a substantial nexus to the New York apartment. Civil Court, however, did not find “particularly persuasive” the fact that the tenant’s “electrical usage in her New York City apartment was well below average, and that it was significantly lower than her usage in Vermont.” In the court’s view, these facts were not probative of whether the tenant did not use her New York apartment because it was undisputed that the tenant does not occupy the New York apartment “full time” while her companion occupied the Vermont house “full time”; and that the Vermont electric bills cover heat and hot water, while those utilities are provided by the landlord in New York.
Instead, in determining that the New York apartment was not the tenant’s primary residence, the court found that
“[t]he most persuasive evidence offered at trial was Ms. Mogi’s banking and credit card records. These records include Ms. Mogi’s credit, debit, and ATM transactions over the relevant period, and appear to give an accurate account of her location for most days between 2004 and October 19, 2006. . . .
“Ms. Mogi spent 120 days during the relevant time period visiting her family in Japan. These days tell us nothing about her primary residence. Of the remaining 846 ‘known’ days in the time period, Ms. Mogi appears to have spent 378, or 45%, in New York and 468, or 55% in Vermont.
“Based primarily upon the banking and credit card records, I find that respondent did not spend 183 *119 days per year in her New York apartment. Accordingly, final judgment is directed for petitioner.”
While the court primarily based its determination on the banking and credit card records, the court made reference to other factors that indicated that the tenant’s primary residence was in Vermont, including, inter alia, that the jointly held vehicle was registered in Vermont, and that both women held only Vermont driver’s licenses. The court further found that the tenant’s witnesses who testified that they regularly saw her in New York did not have “any detailed knowledge of when she was in New York and when she was in Vermont.” The court also noted that the tenant “herself also testified that she could not identify dates when she was in New York and dates when she was in Vermont.”
On appeal, the Appellate Term found that Civil Court “may have placed undue emphasis on documents reflecting the credit card and bank transactions made by tenant and her companion” (27 Misc 3d 126[A], 2010 NY Slip Op 50511[U], *1 [2010]). Nevertheless, the Appellate Term found that “any such error [did] not warrant reversal on this record” (id.). Instead, Appellate Term held that a fair interpretation of the evidence supported the Civil Court’s finding that the New York apartment is not the tenant’s primary residence. In this regard, contrary to Civil Court, which found nothing unusual about the tenant’s low electricity use in the New York apartment, Appellate Term noted that the “[landlord established that there was negligible electricity usage in the apartment for more than two years prior to the commencement of this proceeding” (id.). The Appellate Term, however, affirmed based on additional factors which were similarly relied upon by Civil Court, including the tenant’s Vermont driver’s license and the jointly owned vehicle’s Vermont registration. Appellate Term also took into account that the tenant “acknowledged that she spends a substantial amount of time in a house she owns in Westminster, Vermont . . . where [her] long-time companion admittedly primarily resides” (id.). We granted the tenant’s motion for leave to appeal to the Appellate Division, and we now reverse.
Analysis
In view of the considerable protections accorded tenants of regulated units, the beneficiaries of these safeguards are required, as a quid pro quo, to actually and principally utilize their apartments for dwelling purposes (see 542 E. 14th St. LLC v Lee, 66 AD3d 18, 21-22 [1st Dept 2009]; Hughes v Lenox Hill *120 Hosp., 226 AD2d 4 [1st Dept 1996], lv dismissed and denied 90 NY2d 829 [1997]). Thus, the governing statute provides that a landlord may recover possession of a rent-stabilized apartment if it “is not occupied by the tenant ... as his or her primary residence” (Rent Stabilization Code [9 NYCRR] § 2524.4 [c]). “[P]rimary residence” is judicially construed as “ ‘an ongoing, substantial, physical nexus with the . . . premises for actual living purposes’ ” (Katz Park Ave. Corp. v Jagger, 11 NY3d 314, 317 [2008], quoting Emay Props. Corp. v Norton, 136 Misc 2d 127, 129 [App Term, 1st Dept 1987]).
Although the statutes do not define “primary residence,” the Rent Stabilization Code does provide that “no single factor shall be solely determinative,” and lists “evidence which may be considered” in making the determination (9 NYCRR 2520.6 [u]; see e.g. Katz, 11 NY3d at 317; Glenbriar Co. v Lipsman, 5 NY3d 388, 392-393 [2005]; Chelsmore Apts. v Garcia, 189 Misc 2d 542, 543-544 [Civ Ct, NY County 2001], affd 2003 NY Slip Op 50621[U] [2003]). These factors include (1) the tenant’s use or nonuse of an address other than the address of the subject apartment on a tax return, motor vehicle registration, driver’s license, or other publicly filed document; (2) the tenant’s use or nonuse of an address other than the address of the subject apartment as a voting address; (3) whether the tenant lived in the subject apartment for fewer than 183 days in a calendar year; and (4) whether the tenant subleased the apartment (9 NYCRR 2520.6 [u] [1], [2], [3], [4]).
Courts have also considered factors not included in 9 NYCRR 2520.6 (u). For example, a court may examine the tenant’s entire tenancy history in the stabilized apartment to ascertain primary residence (see 615 Co. v Mikeska, 75 NY2d 987, 988 [1990]). A tenant’s telephone and other utility bills that show how often the tenant used utilities in the apartment is probative of whether the tenant had the requisite physical nexus to the apartment (see Carmine Ltd. v Gordon, 41 AD3d 196 [1st Dept 2007]; Briar Hill Apts. Co. v Teperman, 165 AD2d 519 [1st Dept 1991]). Testimony from neighbors and building employees about the tenant’s absence from or presence in the rent-stabilized apartment is yet another factor (see e.g. Harran Holding Corp. v Fowler, NYLJ, Apr. 28, 1987, at 5, col 4).
To prevail in a nonprimary residence proceeding, a landlord must establish by a preponderance of the evidence that during the relevant time period, the tenant did not occupy the subject apartment as his or her primary residence (Glenbriar Co., 5 *121 NY3d at 392). The tenant may rebut the landlord’s proof to establish “a substantial physical nexus to the apartment” (id. at 393, citing Draper v Georgia Props., 94 NY2d 809, 811 [1999]). In terms of the burden of proof, “proof sufficient to make a prima facie showing of nonprimary residence shifts the burden of going forward to the tenant, [but] the ultimate burden of persuasion remains on the landlord seeking eviction on the basis of nonprimary residence” (ACP 150 W. End Ave. Assoc., L.P. v Greene, 15 Misc 3d 1112[A], 2007 NY Slip Op 50589[U], *2 [2007]; see Emel Realty Corp. v Carey, 288 AD2d 163 [1st Dept 2001]).
Here, even when “due regard” is given to the views of the trial judge (300 E. 34th St. Co. v Habeeb, 248 AD2d 50, 55 [1st Dept 1997], quoting Universal Leasing Servs. v Flushing Hae Kwan Rest., 169 AD2d 829, 830 [2d Dept 1991]), we believe that, under any fair interpretation of the record, a clear preponderance of the probative and credible evidence supports the conclusion that the tenant was using the New York apartment as her primary residence for a substantial period of time prior to the service of landlord’s notice of nonrenewal in September 2006.
Indeed, it is uncontested that the tenant has lived in the New York apartment for over 30 years (see 615 Co. v Mikeska, 75 NY2d at 988). Moreover, the tenant’s testimony demonstrated that the New York apartment is fully furnished and she maintained a full-time job in Manhattan during the relevant period. With respect to the tenant’s Vermont house, the tenant’s testimony demonstrated that the house serves not as her primary residence, but as a second residence that she uses on weekends, holidays and vacations. While the tenant undoubtedly has a long-term and deep connection to the Vermont house, it is nothing more than her weekend/vacation home, as corroborated by the testimony of Isogai, and New York cotenants who saw her constantly in the New York apartment during the relevant time period.
Significantly, neither Civil Court, which heard the trial testimony, nor the Appellate Term, made any finding that these witnesses were incredible. As indicated, both Civil Court and Appellate Term were troubled by the fact that none of the tenants had “any detailed knowledge of when [the tenant] was in New York and when she was in Vermont.” There is not, however, an absolute requirement that a tenant quantify the numbers of days he or she spent in the apartment each relevant year. What *122 is significant here is that all the tenant’s friends and cotenants consistently testified of the tenant’s constant presence in the New York apartment during the relevant period, which is sufficient for the purpose of establishing an ongoing, substantial and physical nexus with the regulated premises (see 310 E. 23rd LLC v Colvin, 41 AD3d 149 [1st Dept 2007]; 300 E. 34th St. Co. v Habeeb, 248 AD2d at 55). In our review of the record, we find no basis to reject the New York tenants’ testimonies as incredible. In fact, the landlord failed to produce any witness who lived or worked in the New York apartment building during the relevant time period to rebut their testimony.
Likewise, there is simply no reason to find that the tenant’s testimony was not credible. Unlike the Appellate Term, we are not troubled by the fact that the tenant “acknowledged that she spends a substantial amount of time in a house she owns in . . . Vermont . . . where [her] long-time companion admittedly primarily resides” (2010 NY Slip Op 50511[U], *1). For there is nothing inconsistent with the tenant having a primary residence in New York and concomitantly spending “a substantial” amount of time in Vermont with her long-time friend and companion. An apartment should not be decontrolled merely because its tenant decides to spend her weekends, holidays and vacation days in a second home that she shares with a long-term friend and companion.
Indeed, legitimate arrangements of this kind have been consistently recognized by this Court (see e.g. 310 E. 23rd LLC v Colvin, 41 AD3d at 149-150 [“subject apartment was at all relevant times respondent’s primary residence and that the house she owns in upstate New York is a second residence that she uses on weekends, holidays and vacations”]). For instance, in Glenbriar Co. v Lipsman (11 AD3d 352 [1st Dept 2004], affd 5 NY3d 388 [2005]), this Court found that a wife could consider New York City her primary residence even though both spouses resided together as “snowbirds,” part time in Florida, and part time in New York City, and the husband had “embraced Florida as his residence for its tax advantages and to preserve his assets in retirement” (Glenbriar Co. v Lipsman, 2002 NY Slip Op 50225[U], *5 [App Term, 1st Dept 2002, Gangel Jacob, J., concurring]). These types of arrangements are consistent with the restrictions of rent stabilization, which is designed to preclude the warehousing of apartments by those who establish primary residence elsewhere (Katz, 11 NY3d at 317-318); it was not intended to allow the eviction of an individual, like the ten *123 ant here, who travels extensively for personal reasons but who otherwise maintains a substantial physical nexus with her New York City apartment.
We find that the credibility of the witnesses, who established that the tenant has maintained a substantial physical nexus with her New York apartment, is not seriously undercut by the documentary evidence. As indicated by Appellate Term, Civil Court’s reliance upon credit and debit card transactions to determine when the tenant was at her second home in Vermont was speculative, as both respondent and her companion (a Vermont resident) are authorized to use the cards. Further, even under the Civil Court’s speculative formula, and allowing some margin of error for same, it is significant that the tenant was in New York 45% of the time, which is not insignificant. As for the other factors relied upon by Appellate Term, the tenant appears to have adequately explained her low electrical consumption in New York (see Briar Hill Apts. Co., 165 AD2d at 522-523), and it is not remarkable that her driver’s license and vehicle registration were issued in Vermont, as the vehicle is co-owned with the tenant’s close friend.
In sum, this Court finds that the preponderance of the evidence establishes that the tenant occupied the subject New York apartment as her primary residence during the 2004-2006 period. Inconclusive is the evidence the landlord introduced to buttress its theory that the tenant maintained her Vermont cabin rather than the subject apartment as her primary residence. The landlord’s evidence is explainable and is as likely, if not more likely, to support a finding that the tenant occupied the subject apartment as her primary residence. Given the documentary and testimonial evidence connecting the tenant to the subject apartment, the landlord has not met its burden to persuade this Court that the tenant did not occupy the subject apartment as her primary residence during the 2004-2006 period.
Accordingly, the order of the Appellate Term of the Supreme Court, First Department, entered on or about March 29, 2010, which, in a nonprimary residence holdover proceeding, affirmed a judgment of Civil Court, New York County (Jean T. Schneider, J.), entered on or about August 8, 2008, after a nonjury trial, awarding petitioner-landlord possession of the subject premises, should be reversed, on the law and the facts, without costs, the holdover petition denied, and the proceeding dismissed. The Clerk is directed to enter judgment accordingly.